232 N.J. Super. 182 (1989)
556 A.2d 1236
HOLMDEL BUILDERS ASSOCIATION, PLAINTIFF-RESPONDENT,
v.
TOWNSHIP OF HOLMDEL; THE TOWNSHIP COMMITTEE OF HOLMDEL AND THE PLANNING BOARD OF THE TOWNSHIP OF HOLMDEL, DEFENDANTS-APPELLANTS. NEW JERSEY CHAPTER OF THE NATIONAL ASSOCIATION OF INDUSTRIAL AND OFFICE PARKS, PLAINTIFF-RESPONDENT,
v.
TOWNSHIP OF SOUTH BRUNSWICK IN THE COUNTY OF MIDDLESEX, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH BRUNSWICK, THE PLANNING BOARD OF THE TOWNSHIP OF SOUTH BRUNSWICK AND THE ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF SOUTH BRUNSWICK, DEFENDANTS-APPELLANTS. NEW JERSEY BUILDERS ASSOCIATION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
THE TOWNSHIP OF CHESTER IN THE COUNTY OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY AND THE MAYOR AND COUNCIL OF THE TOWNSHIP OF CHESTER, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS. CALTON HOMES, INC., PLAINTIFF-RESPONDENT,
v.
TOWNSHIP OF MIDDLETOWN, A MUNICIPAL CORPORATION, AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MIDDLE-TOWN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 1989.
Decided March 30, 1989.
*185 Before Judges ANTELL, DREIER and HAVEY.
Eugene A. Iadanza and Ronald Lee Reisner, argued the cause, for appellants Township of Holmdel and Township Committee of Holmdel (Gagliano, Tucci, Iadanza and Reisner, attorneys, Eugene A. Iadanza of counsel, Shaun R. Schlich, on the briefs).
*186 Dowd & Reilly, for appellant Planning Board of the Township of Holmdel (Bernard M. Reilly, on the brief).
Joseph J. Benedict, argued the cause, for appellants Township of South Brunswick and Township Committee of the Township of South Brunswick (Benedict and Altman, attorneys), David Mask, argued the cause, for appellant Planning Board of the Township of South Brunswick (McGimpsey and Cafferty, attorneys, Joseph J. Benedict and Thomas J. Cafferty on the joint brief).
Alfred L. Ferguson argued the cause for appellants Township of Chester and Mayor and Council of the Township of Chester (McCarter & English, attorneys, Alfred L. Ferguson of counsel and on the brief with Gary T. Hall).
Bernard M. Reilly argued the cause for appellants Township of Middletown and Township Committee of the Township of Middletown (Dowd & Reilly, attorneys, William F. Dowd, on the brief).
Henry A. Hill argued the cause for respondents and cross-appellant (Brener, Wallack & Hill, attorneys, Henry A. Hill on the briefs with Thomas F. Carroll, III, Steven H. Merman and Mitchell Newman).
Stephen Eisdorfer, Assistant Deputy Public Advocate, argued the cause of amicus curiae New Jersey Department of the Public Advocate (Alfred A. Slocum, Public Advocate of New Jersey, attorney, Stephen Eisdorfer, on the briefs).
Ralph J. Kmiec, Municipal Attorney, argued the cause on behalf of intervenor Township of Cherry Hill (Ralph J. Kmiec, on the briefs).
The opinion of the court was delivered by HAVEY, J.A.D.
In these actions in lieu of prerogative writs, consolidated for the purpose of this appeal, we are called upon to decide whether *187 a municipality may exact development fees as a condition to constructing residential and nonresidential units within the municipality. Each of the challenged ordinances provide that the fees shall be paid by developers into an affordable housing trust fund, utilized by the municipality to satisfy its Mt. Laurel II obligation.[1] Specifically, the issue raised is whether or not such ordinances have been authorized by the Legislature under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1, et seq., the Fair Housing Act (Act), N.J.S.A. 52:27D-301, et seq., or the municipality's general police power, N.J.S.A. 40:48-1 and N.J.S.A. 40:48-2. We must also determine whether an ordinance requiring a mandatory set-aside of affordable units as a condition to residential subdivision approval must provide for a compensating benefit, by density bonus or other zoning incentive.
The four ordinances challenged here were adopted by the Townships of Chester, South Brunswick, Middletown and Holmdel. In separate actions, each trial court declared the ordinance before it facially invalid, each holding that the ordinance constituted a revenue-raising device which had no legislative authority.[2]
Although the issues raised by these consolidated appeals are similar, it is necessary to describe briefly the components of each ordinance.

CHESTER TOWNSHIP ORDINANCE
Chester Township's ordinance imposes a development fee on all new commercial and residential construction, except developments *188 which provide low or moderate-income housing. Issuance of a certificate of occupancy is conditioned upon payment of the fee. The fee is paid into a fund designed to (1) provide technical assistance to small lot owners to encourage them to construct low-cost housing; (2) permit the township itself to develop low-cost housing; (3) aid the township in managing low-cost housing programs, and (4) provide for grants, subsidies or loans in satisfaction of its Mt. Laurel II obligation. The amount of the fee varies depending upon the size of the project, ranging from 25¢ to 75¢ per square foot of the unit or units being constructed.
Plaintiff in the Chester litigation, New Jersey Builders Association, is a trade organization consisting of more than 2,500 residential and commercial developers doing business statewide. Prior to commencement of the action, Chester Township had collected over $200,000 in fees from plaintiff's members. Plaintiff has cross-appealed the order of the trial court dismissing its demand for a refund on behalf of its owners.

SOUTH BRUNSWICK TOWNSHIP ORDINANCE
South Brunswick's ordinance also imposes a development fee on all new residential and nonresidential development, with exceptions not here pertinent. The fee must be paid as a condition to subdivision or site plan approval, and is computed based on square footage, ranging from 10¢ to 15¢ per square foot for residential development, and 25¢ to 50¢ per square foot for nonresidential development. The declared purpose of the ordinance was to receive contributions into a fund to permit rehabilitation of substandard housing by the municipality in order to provide its fair share of affordable housing. Plaintiff is an association of developers and owners of nonresidential property doing business throughout the State.

MIDDLETOWN TOWNSHIP ORDINANCE
Middletown's ordinance provides that all new major residential subdivision and site plan applications must set aside 7% *189 of the development's total dwelling units for lower income housing. On tracts other than those zoned specifically for inclusionary development, a developer may make a cash contribution to the affordable housing trust fund in lieu of constructing the affordable units. All nonresidential developers are required to pay a development fee into the fund. For residential construction, the fee ranges from 80¢ to $1.80 per square foot, depending upon total gross floor area. The nonresidential development fee is based on a complex formula, using various "coefficients." The intended purpose of the ordinance is to permit the township to participate in regional contribution agreements, offer grants for the rehabilitation of existing structures and allow the township itself to build affordable housing. Plaintiff is a contract purchaser of a large tract of land situate within the municipality.

HOLMDEL TOWNSHIP ORDINANCE
Prior to 1986, the residentially-zoned land in Holmdel designated R-40A permitted a maximum density of .8 dwelling units per acre. In 1986, the governing body passed on first reading an amendment to the ordinance, creating an R-40B zone, affecting specific parcels originally zoned R-40A. The R-40B zone downgraded density from .8 to .4 units per acre. However, developers were given the option of building at a density of .6 units per acre by agreeing to pay a fee equal to 2.5% of the sales price of the residential units into the municipality's housing trust fund.
Various property owners filed a statutory protest against the zoning change. See N.J.S.A. 40:55D-63. Also, the planning board had various technical objections to the ordinance. Nevertheless, the governing body adopted the ordinance in December 1986 and plaintiff, an association of property owners and builders, responded by filing the present action. Plaintiff not only challenged the development fee, it also asserted that the reduction in density from .8 to .4 units per acre was not a valid *190 exercise of the zoning power, and that the ordinance was adopted in a procedurally improper manner. The trial court essentially invalidated all of the ordinance, concluding first that the development fee was an invalid revenue-raising device, and second that reducing density and then permitting a density increase upon payment of a development fee constituted an abuse of the township's zoning power. The court characterized Holmdel's actions as a "municipal slight-of-hand."
The challenged ordinances were adopted in response to our Supreme Court's pronouncements in So. Burl. Cty. N.A.A.C.P. v. Tp. of Mt. Laurel, 67 N.J. 151, 174 (1975), app. dis. sub. nom. Township of Mount Laurel v. Southern Burlington County NAACP, et al., 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mt. Laurel I) and Mt. Laurel II, supra, 92 N.J. at 260-261 that municipalities must adopt land use regulations which create a realistic opportunity for the construction of low and moderate income housing. Mt. Laurel II set forth a number of techniques available to municipalities in order to meet their obligation, including removing cost-generating restrictions not essential to the general welfare, obtaining available governmental subsidies, and utilizing incentive zoning and mandatory set-asides. 92 N.J. 265-270. The court held that use of such inclusionary devices "keyed to the construction of lower income housing, are constitutional and within the zoning power of a municipality." Id. at 271. The court also provided for a "builder's remedy." Id. at 278-281.
In response to Mt. Laurel II, the Legislature passed the Fair Housing Act, N.J.S.A. 52:27D-301, et seq. The act creates the Council On Affordable Housing (COAH), N.J.S.A. 52:27D-305, and charges it with the responsibility of determining the State's need for low-cost housing and assigning a specific "fair share" number to each municipality. N.J.S.A. 52:27D-307. See also generally Hills Dev. Co. v. Bernards Tp. in Somerset Cty., 103 N.J. 1, 21-23 (1986). The Act sets forth a number of permissible zoning techniques available to municipalities to meet their fair share, including "[r]ezoning for densities necessary *191 to assure the economic viability of any inclusionary developments, either through mandatory set-asides or density bonuses[.]" N.J.S.A. 52:27D-311a(1). A municipality may, but need not, use municipal revenues to provide its fair share of low-cost housing. N.J.S.A. 52:27D-311a(8) and 52:27D-311d.
The defendant municipalities and Public Advocate contend that the development fee ordinances are sustainable because they are the "functional equivalent" to the mandatory set-aside recognized by Mt. Laurel II and the act, and thus a valid land use regulation. Defendants argue that since developers may be required to build lower income units as a condition to subdivision or site plan approval, they may also be required to pay the cash equivalent to the municipality for rehabilitation or construction of low-cost housing by the municipality itself. As authority for this proposition, defendants point to the following language in Mt. Laurel II:
[W]e in no way intend our list [of inclusionary zoning devices] to be exhaustive; municipalities and trial courts are encouraged to create other devices and methods for meeting fair share obligations. [92 N.J. at 265-266].

I
Recently, our Supreme Court in N.J. Bldrs. Ass'n v. Bernards Tp., 108 N.J. 223, 230-232 (1987) recognized the nationwide trend toward imposing exactions upon developers, including "impact fees" for the construction of public capital improvements, as well as "linkage" ordinances that condition the right to develop on construction of or contribution to the cost of low and moderate-income housing. The court observed that most cases considering the validity of such exactions "do so in the context of the underlying statutes that set forth the powers of local governments in reviewing subdivision and development applications." Id. at 233-234. See also 4 Anderson, American Law of Zoning (2d ed. 1977), § 23.40 at 145; and see Smith, "From Subdivision Improvement Requirements to Community Benefit Assessments and Linkage Payments: A Brief History of Land Development Exactions," 50 Law and Contemporary *192 Problems 5, 10 (Winter 1987) ("[a]bsent free-wheeling home rule authority, express or implied statutory authority is crucial to the validity of an exaction.").
In New Jersey it is well-settled that a municipality is "but a creature of the State, capable of exercising only those powers granted to it by the Legislature." Moyant v. Paramus, 30 N.J. 528, 535 (1959); see also Dome Realty, Inc. v. Paterson, 83 N.J. 212, 225 (1980). A municipality has no revenue-raising power, including the power of taxation, without an explicit constitutional or legislative grant. Moyant v. Paramus, supra, 30 N.J. at 543; Daniels v. Point Pleasant, 23 N.J. 357, 360-361 (1957). The power to originate a tax for revenue is vested in the Legislature. N.J. Const. (1947), Art. IV, § VI, par. 1; see also Atlantic City Casino Hotel v. Casino Control Com'n., 203 N.J. Super. 230, 236 (App.Div.), certif. den. 102 N.J. 326 (1985). Property must be assessed for taxation under general laws and by uniform rules. N.J. Const., supra, Art. VIII, § I, par. 1.
In Daniels v. Point Pleasant, supra, 23 N.J. at 362, the Supreme Court held that although a municipality has the power under N.J.S.A. 40:48-1 to meet the construction of buildings and charge license fees to meet incidental costs, it cannot employ its regulatory power for the sole purpose of raising revenue "to defray the general cost of government...." The court reasoned:
Admittedly, the purpose of the ordinance was to raise revenue to defray the increased cost of school and other government services. The philosophy of this ordinance is that the tax rate of the borough should remain the same and the new people coming into the municipality should bear the burden of the increased costs of their presence. This is so totally contrary to tax philosophy as to require it to be stricken down; see Gilbert v. Town of Irvington, 20 N.J. 432 (1956). [Ibid.]
Similarly, in West Park Ave., Inc. v. Ocean Tp., 48 N.J. 122 (1966), municipal officials conditioned the issuance of building permits and certificates of occupancy upon the developer agreeing to pay to the board of education $300 per house to be placed in a trust fund for capital improvement of the township's *193 schools. Id. at 124-125. The court held that while the Legislature authorized the municipality to require the developer to install improvements peculiarly benefiting the land being developed (see N.J.S.A. 40:55-1.21, now repealed), it had no statutory authority to pay for governmental services traditionally supported by general taxation by the exaction of such fees. 48 N.J. at 126-127. The court observed that "[t]he dollar burden would likely be unequal if new homes were subjected to a charge in addition to the general tax rate." Id. at 126.
Recently, in Nunziato v. Edgewater Planning Bd., 225 N.J. Super. 124, 133-134 (App.Div. 1988), we struck down a "voluntary" fee paid by the developer of a high-rise condominium of $500 per unit as a condition to variance and site plan approvals. We concluded that such exactions must be supported by enabling legislation and local ordinance, with appropriate standards to prevent arbitrary, "free-wheeling bidding" for development approvals. Id. at 134.
In view of the foregoing case law authority, we share the view expressed by each of the trial courts that mandatory development fee ordinances are nothing more than revenue-raising devices which have no legislative authority. As such, particularly in view of their compulsory nature, see Gross v. Ocean Tp., 184 N.J. Super. 144, 150 (App.Div. 1982), rev'd on other grounds 92 N.J. 539 (1983), the development fees constitute an illegal tax imposed upon a discrete group of landowners and taxpayers for the single purpose of satisfying a general municipal obligation to provide a realistic opportunity for affordable housing. As in West Park Ave., the developer of new construction suffers a double tax: first, the development fee itself, representing a "price" to build within the municipality, and second, the general property tax imposed upon the newly developed land, also available for use to defray the cost of the municipality's community-wide Mt. Laurel obligation. See 48 N.J. at 126-127. This shifting of a public responsibility to a limited segment of the community is not only without legislative *194 authority, it also violates the rule of uniform taxation established by our State constitution. See N.J. Const., supra, Art. VIII, § I, par. 1. It would be highly inequitable to tax but a small segment of the community, current and future builders, rather than all property owners, to remedy the municipality's prior default in providing for inclusionary housing.
We do not share defendants' view that the development fee is "functionally equivalent" to the mandatory set-aside technique recognized by Mt. Laurel II. Mt. Laurel II held that "inclusionary devices such as density bonuses and mandatory set-asides keyed to the construction of lower income housing, are constitutional and within the zoning power of a municipality." 92 N.J. at 271. Citing Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6 (1976), app. dis. sub. nom. Feldman, et al. v. Weymouth Township, et al, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977), the court concluded that if a zoning ordinance restricting a particular district exclusively for mobile homes for the elderly is sustainable as a valid land use regulation, it follows that the "comparable special need of lower income families for housing, and its impact on the general welfare," could justify a land use restriction creating a zone that included such use. Mt. Laurel II, supra, 92 N.J. at 272. The court rejected as "artificial" the distinction between the regulation tied to the physical use of property and the one tied to the income level of those who use the property. Id. at 273.
What is clear from Mt. Laurel II is that a mandatory set-aside is valid because it advances the general welfare by regulating land use. However, we do not read the decision as embracing a pure revenue-raising device as valid land use regulation, even if the revenue raised will be utilized for the construction or rehabilitation of low-cost housing. Zoning ordinances adopted under the MLUL must bear a real and substantial relationship to the regulation of land, advance a statutory purpose of zoning, and advance the authorized purpose "in a manner permitted by the Legislature." State v. C.I.B. International, 83 N.J. 262, 271-272 (1980). A mandatory development *195 fee applied indiscriminately as a price to build within the municipality has no "real and substantial relationship to the regulation of land," id. at 271, nor does it advance a purpose of zoning "in a manner permitted by the Legislature." Id. at 272.
Alternatively, the municipalities argue that the Fair Housing Act provides the necessary authority for the development fee. They point to N.J.S.A. 52:27D-311a(8), which states that a municipality's housing element may include "[u]tilization of municipally generated funds toward the construction of low and moderate income housing," and reason that the development fees provide these "municipally generated funds." The problem with this argument is that the statute speaks only to the utilization of such funds; it does not address how municipalities may raise the funds. Our courts have demanded far more specificity than this before finding that the Legislature has given a municipality the power to raise revenue. See Salomon v. Jersey City, 12 N.J. 379 (1953); cf. Divan Builders v. Planning Bd. Tp. of Wayne, 66 N.J. 582, 596-597 (1975) (N.J.S.A. 40:55-1.21, now repealed, sufficiently specific to empower municipalities to demand off-site improvements as condition to subdivision approval). We believe that, in view of the potentially far-reaching source of revenue that could be generated from such mandatory development fees, the Legislature would have specifically authorized such fees if it so intended.[3]

II
Beyond the question of whether the development fee ordinances are statutorily sanctioned, we do not read Mt. Laurel *196 II or the Fair Housing Act as intending to burden current and future builders with the full obligation to solve the affordable housing crisis. To be sustainable, a development fee ordinance must provide some compensating benefit to a new developer since it is paid as an alternative to the assumption of other Mt. Laurel obligations. In Mt. Laurel I, the Supreme Court held that a developing municipality "must, by its land use regulations, presumptively make realistically possible an appropriate variety and choice of housing." 67 N.J. at 174 [emphasis supplied]. Mt. Laurel II held that the "constitutional basis for the Mt. Laurel doctrine remains the same." 92 N.J. at 208. Land use regulations that do not provide "the requisite opportunity" for a fair share of the region's needs for low and moderate income housing conflict with the general welfare and violate the State constitutional requirement of substantial due process and equal protection. Ibid; see also Hills Dev. Co. v. Bernards Tp. in Somerset Cty., supra, 103 N.J. at 20.
Mt. Laurel II suggests that techniques such as density bonuses and mandatory set-asides are essential because of the economic reality that "[s]atisfaction of the Mount Laurel doctrine cannot depend on the inclination of developers to help the poor. It has to depend on affirmative inducements to make the opportunity real." 92 N.J. at 261 [emphasis supplied]. In other words, "[f]or an opportunity to be `realistic' it must be one that is at least sensible for someone to use." Ibid. The Fair Housing Act codified this concept by permitting the inclusion in a municipality's housing element "[r]ezoning for densities necessary to assure the economic viability of any inclusionary developments, either through mandatory set-asides or density bonuses, as may be necessary to meet all or part of the municipality's fair share[.]" N.J.S.A. 52:27D-311a(1) [emphasis supplied].
We agree with plaintiffs that the intent of both Mt. Laurel II and the Fair Housing Act is that mandatory set-asides must be accompanied by density bonuses in order to compensate the *197 developer for the cost of constructing the Mt. Laurel housing. Without such benefits, developers have no economic incentive to build such housing, and thus no "realistic opportunity" is offered by the ordinance to satisfy the municipalities' Mt. Laurel obligation. As Judge Skillman explained in Van Dalen v. Washington Tp., supra, 205 N.J. Super. at 339:
The theory of mandatory set-asides without subsidization is that the requirement will be accompanied by higher-density zoning than normally would be permitted. Such higher-density zoning permits a developer to construct more units and thereby to cover any shortfall between what lower income households can afford and the real costs of construction. In effect, an increase in permitted densities generates any subsidies necessary for lower income housing, without cost either to the developer or non-lower income residents of the development.
See also Mallach, "Atlantic City, the Casinos, and the Mount Laurel II Decision," 15 Rutgers Law Journal, 695, 719 (Spring 1984) ("[i]f the full Mount Laurel obligation is imposed on developers, the full array of feasible cost-reduction activities, subsidies, and other supports should be provided to the developer on whose shoulders the Mount Laurel obligation is being placed.").
N.J. Bldrs. Ass'n. v. Bernards Tp., supra, 108 N.J. 223, while not directly on point, is instructive. There the question was whether an ordinance requiring new developers to pay their pro-rata share of the township's long-term road improvement plan exceeded the township's authority conferred by N.J.S.A. 40:55D-42. Id. at 224. That statute permits a governing body to adopt an ordinance conditioning site plan or subdivision approval upon the developer paying "his pro-rata share" of the cost of off-site improvements, which are "necessitated or required by construction or improvements within such subdivision or development." Pre-MLUL decisions, codified by N.J.S.A. 40:55D-42, held that a developer may be compelled to pay only "that portion of the cost which bears a rational nexus to the needs created by, and benefits conferred upon, the subdivision." Longridge Builders, Inc. v. Planning Bd. of Princeton Tp., 52 N.J. 348, 350 (1968); see also Divan Builders v. Planning Bd. Tp. of Wayne, supra, 66 N.J. at 600; Brazer v. Borough of *198 Mountainside, 55 N.J. 456 (1970). Beyond that, "[p]lanning [b]oard impositions ... amount to impermissible exactions." Id. at 466. Recognizing the pre-MLUL decisions, the court in N.J. Bldrs. Ass'n. v. Bernards Tp., struck down the township's ordinance, interpreting N.J.S.A. 40:55D-42 as limiting "municipal authority only to improvements the need for which arose as a direct consequence of the particular subdivision or development under review." 108 N.J. at 237; see also Baltica Const. v. Planning Bd., 222 N.J. Super. 428, 433 (App.Div. 1988).
Although N.J. Bldrs. Ass'n. v. Bernards Tp., applies the "rational nexus" test to off-site improvement exactions under a specific statute, the case underscores the fairness of requiring a rational or reasonable relationship in "impact fee" and "linkage" ordinances between the exaction imposed and the benefit conferred, even when the exaction has legislative sanction.[4] Indeed, it may be argued that for the exaction imposed here, there is an even more compelling reason to provide a compensating benefit to the developer: the "need" for affordable housing is not "created by" the proposed development, at least if it is a residential subdivision. Rather, the need pre-existed the application, caused by a continued history of exclusionary zoning attributable to the municipality's zoning practice, not to the proposed subdivision.
The "rational nexus" and "reasonable relationship" tests have been applied by courts in other jurisdictions in examining the validity of "linkage" ordinances. In Terminal Plaza v. *199 City & Co. of San Francisco, 177 Cal. App.3d 892, 223 Cal. Rptr. 379 (Ct.App. 1986), the court reviewed a San Francisco ordinance which prohibited conversion of residential hotel units to any other use unless the owner constructed a replacement unit, rehabilitated a similar unit, or paid a fee in lieu of satisfying this requirement to the city's residential preservation fund. The court concluded that the exaction was valid because of the reasonable relationship between the ordinance and the problem created by the developers in converting residential hotel units, otherwise available for affordable housing, to another use. Id. at 386-387. In San Telmo Associates v. City of Seattle, 108 Wash.2d 20, 735 P.2d 673, 675 (1987), an ordinance conditioning conversion of low-income housing to nonresidential use upon providing relocation assistance or paying an in lieu fee was declared an invalid "tax," because it shifted the public responsibility of providing such housing to a limited segment of the population. See also Delaney, Gordon and Hess, "The Needs-Nexus Analysis: A Unified Test for Validating Subdivision Exactions, User Impact Fees and Linkage," 50 Law and Contemporary Problems, supra, at 148-153.
COAH itself has incorporated the requirement that a developer be given compensating benefits for mandatory set-asides. N.J.A.C. 5:92-8.1, et seq., provides for adjustments to a municipality's fair share, and permits COAH to "presumptively require a 20 percent maximum set-aside and a minimum gross density of six units per acre on vacate and developable sites." N.J.A.C. 5:92-8.4.[5] All agreements involving single-family units that vary from these presumptive requirements may provide that:
... in exchange for an increase over existing density, the developer either: construct low and moderate income units as part of an inclusionary development; or pay a voluntary fee to be utilized by the municipality for an RCA or municipally constructed low and moderate income housing. The developer's expense in either case must bear a reasonable relationship to the increase in *200 density, such that the agreement does not violate the test in (d)1-3 above. [N.J.A.C. 5:92-8.4(e) (effective July 18, 1988); emphasis added].
Subparagraphs (d)1-3 require all agreements: (1) to provide the requisite realistic opportunity for creation of low and moderate income units; (2) not to impose an excessive burden on the market units, giving due consideration to due process and equal protection rights, and (3) to assure the financial ability of the developers to perform the agreement. Thus, the very agency charged with the responsibility of implementing the Fair Housing Act has concluded that voluntary agreements must provide for compensating benefits for mandatory set-asides. While we are not bound by COAH's interpretation of the act, we should give substantial deference to the interpretation of the act by the agency charged with enforcing it. See Smith v. Director, Div. of Taxation, 108 N.J. 19, 25 (1987).
We are not unmindful of our Supreme Court's holding in Matter of Egg Harbor Associates (Bayshore Centre), 94 N.J. 358 (1983), which sustained a mandatory set-aside of 20% affordable housing units as a condition to approval under the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to 21. The issue in Egg Harbor was whether the act authorized the Department of Environmental Protection (DEP) to condition CAFRA approval upon the construction of affordable housing within the proposed development. Id. at 361. The court found such authority existed on the theory that the Legislature had conferred broad powers in the DEP to regulate all land use in coastal areas. Id. at 372. It reasoned that since municipalities have the zoning power to create housing opportunities for the poor, it would "make no sense at all to hold" that a State agency may not use such power. Id. at 367.[6]
*201 In our view, Egg Harbor is not dispositive. There the emphasis was on the condition as a use restriction, not as an exaction. The court rejected the developer's claim that the condition was confiscatory because the developer had failed to demonstrate that building the development "will not return a profit or will return a profit so low as to amount to a taking." Id. at 374. The court did not discuss the need for a rational nexus.
However, it can be concluded from the unique, highly intense use proposed by the Egg Harbor developer that compensating benefits were in fact conferred. The proposal included 1,530 residential units, a 500-room hotel, a 300-slip marina, a 22-story office building, and 4,200 parking spaces on a 127-acre tract. Id. at 362. The DEP concluded that "[g]iven the magnitude and variety of uses proposed ...," a contribution by the project toward meeting the full range of housing needs in the municipality and region was justified. Id. at 363. We question whether the set-aside condition would have been sustainable if only 64 residential units, for example, had been proposed for the site, instead of the highly intense proposal actually submitted.

III
For the foregoing reasons, we conclude that an ordinance which provides for a mandatory set-aside, and which also gives the developer a density bonus or other zoning incentive having a reasonable relationship to the cost incurred in constructing the mandatory set-aside housing, is sustainable. We also conclude that a voluntary provision for an "in lieu" development fee, paid into a fund for the construction of Mt. Laurel housing is sustainable, provided that the fee charged bears a reasonable relationship to the benefits conferred by the density bonus. Such a scheme not only advances Mt. Laurel *202 II's goal, it does so by regulating land use rather than by solely raising revenue. Also, absent in such a scheme is the compulsory nature of a tax, since the developer may either construct the mandatory set-aside units or pay a comparable "in lieu" fee. Of most importance is that such an ordinance makes it "realistically possible" for the developer to build the low-income units or pay the "in lieu" fee by off-setting the attendant cost with the construction of higher density, non-inclusionary units.
Applying the foregoing principles to the four ordinances challenged here, we conclude as follows:

CHESTER AND SOUTH BRUNSWICK TOWNSHIPS
The Chester and South Brunswick ordinances impose a mandatory fee on all new residential and commercial development as a condition to the right to build. Imposition of the fee under both ordinances is unrelated to a particular parcel or particular district. Rather, it is imposed on all new development as a price for building within the municipality. As such, it is nothing more than a revenue-raising device which shifts the burden of providing affordable housing to a discrete segment of the population. Further, neither ordinance gives a reasonable compensating benefit to off-set the development fee expense. We therefore conclude that the ordinances are unlawful taxes, imposed without legislative sanction.

MIDDLETOWN TOWNSHIP
For the reasons expressed above, that portion of Middletown's ordinance which imposes a mandatory development fee upon all nonresidential development is without statutory authority and therefore invalid. Since residential developments are required to set aside 7% of the units for affordable housing or pay an "in lieu" development fee without receiving a reasonable density bonus or other zoning incentive in return, we conclude that that condition is also an impermissible exaction.

*203 HOLMDEL TOWNSHIP
Holmdel's ordinance is distinguishable from the others. It focuses on a particular land use within a particular zoning district rather than on indiscriminate revenue raising. Also, the developer is entirely free to construct at a density of .4 units per acre without payment of a development fee. If the developer pays the fee, it is given a density bonus of .2 units per acre.
Because of the voluntary nature of the ordinance and its compensating benefit, we do not agree with the trial court that the ordinance is facially invalid. In our view, a full factual inquiry is necessary to determine whether the voluntary development fee is reasonable. Without a factual record, we cannot determine, for example, whether it is rational to base the fee on a percentage of the total purchase price of the homes sold, nor can we determine whether the .2 unit density bonus reasonably compensates the developer for the exaction imposed. Finally, a factual inquiry is necessary to determine whether even the .6 unit density provides a "realistic opportunity" to satisfy Holmdel's Mt. Laurel obligation.
Moreover, we are satisfied the trial court erred in holding, without a plenary hearing, that reduction in density from .8 to.4 units per acre was an abuse of zoning power. A zoning ordinance enjoys a presumption of validity, which may be overcome by a showing that the ordinance is "clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the [zoning] statute." Riggs v. Long Beach Tp., 109 N.J. 601, 611 (1988), quoting Bow & Arrow Manor v. Town of West Orange, 63 N.J. 335, 343 (1973). The party challenging the ordinance bears the burden of overcoming the presumption. Kozesnik v. Montgomery Twp., 24 N.J. 154, 167 (1957). If Holmdel downgraded the density and now permits upgrading simply as a guise to exact fees from the developer, the ordinance may indeed not have had a valid *204 zoning purpose. Such a technique would be analogous to the rezoning of property for the single purpose of deflating its value prior to the municipality's condemnation of the property, a device held invalid in Riggs v. Long Beach Tp., supra, 109 N.J. at 615. However, an inquiry as to the municipality's intent, and whether the ordinance advances a valid purpose of zoning involve factual questions which can only be resolved following a plenary hearing.
Accordingly, we remand to the Law Division for a plenary hearing respecting the validity of Holmdel's ordinance. At the remand hearing, the trial court shall also address plaintiff's contention that the governing body failed to comply with N.J.S.A. 40:55D-62a in adopting the ordinance.

IV
On New Jersey Builders Association's cross-appeal, it contends that the trial court erred in dismissing its demand for a refund of fees paid by its members under Chester Township's development fee ordinance. The trial court concluded that plaintiff lacked standing to assert the claim. We agree.
A trade organization such as plaintiff may not assert its members individual damage claims. See Mill Race Ltd. v. Mayor & Tp. of Bernards, 230 N.J. Super. 160, 166 (App.Div. 1989); see also Travel Agts. Malpractice v. Regal Cul. Soc., Inc., 118 N.J. Super. 184, 190 (App.Div.), certif. den. 60 N.J. 353 (1972). While plaintiff has a real interest in having the development fee ordinance declared invalid, the real parties in interest in collection of the fees are its individual members. The trial court properly dismissed this claim without prejudice to the rights of the individual members to seek return of the funds in separate actions.
Affirmed in part; reversed and remanded in part.
NOTES
[1] So. Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158 (1983) (Mt. Laurel II).
[2] The public advocate has participated as amicus curiae, and the Township of Cherry Hill has joined as an intervenor.
[3] In view of our determination that mandatory development fee ordinances have no statutory authorization, we need not address plaintiffs' arguments that the ordinances represent an unconstitutional taking and violate the equal protection and the due process clauses under the state and federal constitutions. See Nollan v. California Costal Commission, 483 U.S. ___, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); Agins v. Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); Van Dalen v. Washington Tp., 205 N.J. Super. 308, 343-344 (Law Div. 1984).
[4] Another relevant revenue-raising device affecting real estate is the assessment of lands benefited by a local improvement. N.J.S.A. 40:56-1, et seq. All assessments are to be "... in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of such improvement." N.J.S.A. 40:56-27. The evident scheme of the local improvement law is not to raise revenue, but simply to create a method of levying assessments on those who have received a special benefit from the expenditure. McNally v. Township of Teaneck, 75 N.J. 33, 43-44 (1977). In sharp contrast to the ordinances before us, this statute also focuses on the rational nexus between the exaction imposed and the benefit conferred.
[5] N.J.A.C. 5:92-8.4 has been recently upheld by us in Twp. of Bernards, Etc., v. Dept. of Community Affairs, 233 N.J. Super. 1 (App.Div. 1989).
[6] The Legislature later concluded that the Supreme Court had mistakenly divined its intent. In 1986, it enacted a statute prohibiting the DEP from requiring "the provision of low and moderate income housing as a condition" for a CAFRA permit. L. 1986, c. 145, now codified as N.J.S.A. 13:19-11.1. The statement of the Assembly Housing Committee noted that the express purpose of the statute was to overturn the court's interpretation of the DEP's power under CAFRA.